DUCKER, JUDGE:
The Claimants, Hans Peter Moss and Lenwood J. Moss, Richard Madison Forney, Jr. and Helen Forney, all of Berkeley Springs, West Virginia, allege damages in the amounts of $300,000, $20,000, $200,000, and $10,000, respectively, against the Department of Finance and Administration, the Department of Natural Resources of *17 the State of West Virginia, as damages resulting from a collision of a 1965 Honda motorcycle owned and operated by Forney, having Moss as a passenger, with a 1967 Plymouth Sedan automobile owned by the State of West Virginia and operated by Arthur Hadley as an agent of the Department of Natural Resources, on September 13, 1969 at about four o’clock in the afternoon on State Route 9, approximately two miles east of Berkeley Springs, in Morgan County, West Virginia. The damages alleged are almost entirely for personal injuries temporary and permanent with the amount of damages to the wrecked motorcycle.
These claims, having arisen in the same accident and being based upon the same facts as to liability, have been heard and considered together as consented to by all the parties.
The accident occurred on a straight stretch of the road at a point where there was a driveway entrance to the home and property of Thomas Maconaughey on State Route 9, the driveway entrance being approximately 175 yards easterly from the top of a low hill curve in the road and about the same distance from the point where the car driven by Arthur Hadley entered Route 9 from a side road easterly of the Maconaughey driveway, that is to say the place of the accident at the Maconaughey driveway was practically at the middle point in a straight-away part of Route 9 between the curve at the west and the side road at the east, affording the riders on the motorcycle and the driver of the Plymouth automobile about the same viewable distances on the road as they approached the point of entrance to the Maconaughey driveway.
The testimony of Hans Peter Moss, age 21, is primarily to the effect that after the motorcycle rounded the curve at the top of the hill and proceeded down along the straightway of the road he noticed a car coming up the road toward the motorcycle and then suddenly turn into the east lane of the road in which the motorcycle was traveling, to enter the Maconaughey driveway; that Forney “hit his brakes” and “swerved to the left to avoid the car but struck the back part of the (Hadley) car behind the right wheel”; that he didn’t see any sign of an intended turn by the Plymouth driver; that the speed of the motorcycle was between 40 and 50 miles an hour; and that he was thrown from the motorcycle to the gravel on the opposite side of the road.
*18 The testimony of Richard Forney, age 21, is substantially the same as Moss. He said he saw the Plymouth car approaching him and the driver look to the left and then he, Forney, “left off the gas to drift because I (he) didn’t know what he (Hadley) was going to do; I thought maybe he might be going to make a left hand turn, so I left off and then he looked back up the hill, so I just kept drifting; as I got down closer, the car just made a left-hand turn in front of me”. Forney said he was “looking right at the vehicle” and no warning signal was given or any left turn signal light operating on the Plymouth before it turned across the road to enter the driveway about forty feet in front of the motorcycle.
Arthur Hadley, of Berkeley Springs, West Virginia, a conservation officer in the Department of Natural Resources for twenty years, the driver of the Plymouth automobile involved in the accident, testified substantially as follows: that on the date of the accident he was returning to Berkeley Springs on State Route 9 from a fire that had been reported to him, and, after having come out of Price Ridge Road about an eighth of a mile east of the Maconaughey farm, he was traveling about thirty miles an hour up a moderate incline westerly toward the Maconaughey farm and put on the signal to turn left and when he got to the lane east of the Maconaughey house he looked up the road and then back through the car mirror but didn’t see any vehicles of any kind and made his turn to go into the Maconaughey driveway; that when he was 300 feet away he activated his directional signals which he said were working and made the left turn into the driveway; that after he got into the driveway with the front part of his car he saw a “blur and something coming to my right” and “I felt a thud”; that he was traveling ten miles an hour when he turned toward the driveway, the car was almost completely in the driveway when struck by the motorcycle; that three wheels were off the driveway as the collision knocked the car sideways; that it was a “real bright sunny day” and the sun was “right square in my eyes” and that he was wearing sun glasses and that he saw nothing before making the turn, no traffic in front or back; and that he didn’t move the car after it was struck.
Lt. Woodrow W. Parsons, a conservation officer whose headquarters were at Romney, West Virginia, testified that he saw the motorcycle at Spiach’s Garage, Berkeley Springs, the day after the accident and that he saw the needle on the speedometer stuck at 65 *19 miles per hour, but he didn’t know what could have happened to the needle as the glass of the speedometer was intact.
Robert Workman, a cycle shop mechanic, testified that a Honda motorcycle has a free-floating speedometer with no real accuracy because it knocks up and down when jolted, and that the needle will break loose from its gear on an impact. On cross examination the witness admitted that if there were something to block the needle of the speedometer and prevent it from returning to the proper speed, the needle may have indicated the speed at the time of impact. Except for such weight as may be given to the evidence as to the needle of the speedometer, there is no contradiction of the evidence of the claimants that the speed of the motorcycle was between forty and fifty miles an hour in a 55 miles an hour speed zone. The only witness to the collision other than the claimants and Hadley was Thomas Leo Maconaughey, who was 13 years old at the time of the accident and who testified that he was 30 to 35 yards away from the road in the Maconaughey yard helping his father saw wood, and that he saw the Hadley car turning into the driveway and the motorcycle strike the right rear end of the car; that the motorcycle was traveling south of the center of the eastbound lane of the road; that the car was not moved until the State Police arrived; that the front part of the Hadley car was in the driveway, the right rear bumper was out on the highway; and that the car “was knocked sideways”.
From the foregoing recital of the testimony and the facts ascertained or ascertainable therefrom, we must first determine whether there is or is not liability on the part of the respondents. Unfortunately, for the respondents, the only substantial testimony in support of the defense is the testimony of the driver of the Plymouth automobile and the substantiality of the evidence as to the speedometer needle. As to the latter, we cannot consider it of sufficient certainty to be of real value. So the real question is whether the testimony of Hadley is sufficient to overcome or disprove the evidence of Moss and Forney. The testimony of Moss and Forney is positive while the testimony of Hadley opens serious questions. While Hadley testified he gave the signals indicating that he was going to turn to the left, he said that it was “a real bright sunny day” and “the sun was right square in my (his) eyes” even though he had on sun glasses, and that he looked up and down the road and saw nothing coming. He couldn’t verify *20 whether the signals were working outside the car. It must be remembered that both the motorcycle and the car first entered the 350 yard straightaway stretch of Route 9 at about the same distance from the place of the collision, and that with 175 yards for the Hadley car to travel before turning into the driveway, it seems reasonable to the Court that Hadley could have seen the motorcycle coming toward him at most any rate of speed, certainly at a lawful rate. We do not doubt the fact that Mr. Hadley didn’t actually see the approaching motorcycle, but the bright sunlight must have been a major factor in preventing him from seeing the oncoming motorcycle'. The fact that he didn’t see is not sufficient to release him of responsibility, because he was obligated, according to the law, to see that the road was clear for a turn from his line of traffic into and across the opposite line of traffic to enter a private driveway.
We think the law as stated in Brake v. Cerra, 145 W.Va. 76, 112 SE 2d 466, is clearly applicable to this case where the Court said:
“Whether the plaintiff did look as he testified he did or whether he did not look as the witness testified he did not, before he started to cross the street, the undisputed evidence is that he did not look effectively, for if he had he would have seen the headlights of the approaching automobile. . .”.
There is no substantial evidence that the motorcycle was out of its proper line of traffic. While motorcycle traffic is often undesirable and quite jeopardizing and annoying to other traffic, travel by such means is not unlawful, and there does not appear here any substantial evidence to suggest that the claimants were not operating their motorcycle within legal requirements and in a reasonable manner.
The law especially applicable in such matters is contained in Chapter 17C, Article 8, Section 8, which provides as follows:
“No person shall.turn a vehicle to enter a private road or driveway or otherwise turn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety. No person shall so turn any vehicle without giving an appropriate signal in the manner hereinafter provided in the event any other traffic may be affected by such movement.”
*21 From all the evidence we must conclude that the respondents’ agent, Hadley, did not make the turn into the Maconaughey driveway in a reasonably safe manner, and that the claimants are entitled to recover substantial damages resulting from such negligence.
The evidence shows that the claimant, Forney, suffered severe injuries which included a compound fragmented fracture of the right tibia and fibula, an extensive evulsed large laceration of the thigh and right knee, and a fracture of his right collarbone (clavicle). He spent twenty-eight days in the hospital and four or more weeks in a wheelchair and then on crutches. While the extent of his impairment is not entirely calculable, nevertheless it constitutes permanent injury. His physician’s charges amount to $355.00, his hospital expenses $1238.24, and the loss of his motorcycle $450.00, making a total of $2,043.24. The evidence shows that the claimant, Moss, suffered severe injuries which included a fracture of the midshift of the right femur, a comminuted fracture of the right tibia and fibula, and multiple lacerations of the right lower extremity, heel and scalp. Likewise the extent of his impairment while not entirely calculable, it amounts to some permanent injury. His physician’s charges were $1156.00, less a $25.00 unrelated charge, or $1131.00, his hospital expenses $1489.54, $34.00, $239.69, and $614.20, making a total of $3508.43.
Accordingly, we award Helen Forney, mother of Richard M. Forney, Jr. the amount she incurred of the doctor’s and hospital expenses of Richard M. Forney, Jr., namely $1593.24; Lenwood J. Moss, father of Hans Peter Moss, the amount he incurred of the doctor’s and hospital expenses, namely, $3508.43; Richard M. Forney Jr., who is now of age, $14,900.00, which includes $450.00 for his motorcycle; and Hans Peter Moss, who is now of age, $21,500.00.
Awards: Helen Forney: $1593.24
Lenwood J. Moss: $3508.43
Richard M. Forney: $14,900.00
Hans Peter Moss: $21,500.00